**ALIZAC PARTNERS and Atlantis Group, Inc., Plaintiffs,**

v.

**ROSPATCH CORPORATION, Joseph A. Parini, Jones Y. Pharr, Jr., J. Grant Beadle, James R. Sebastian, Jr., Ernest R. Seymour, Thomas W. Butler, Jr. and Paul K. Gaston, Defendants.**

No.   G88–311–CA1.

United States District Court, W.D. Michigan S.D.

May 4, 1989.

Dykema, Gossett by Joel E. Krissoff, Grand Rapids, Mich., Stroock & Stroock & Lavan by Melvin A. Brosterman, Edward Tessler, Lauren G. Klein, New York City, Winston & Strawn by David F. Acker, M. Finley Maxson, Paul M. Liebenson, Chicago, Ill., and by Lewis A. Engman, Washington, D.C., for plaintiffs.

Timothy J. McClain, Warner Norcross & Judd, Grand Rapids, Mich., for defendants.

## OPINION

HILLMAN, Chief Judge.

This case arises out of a proxy fight involving plaintiffs, Alizac Partners and Atlantis Group, Inc. and defendant Rospatch. At stake in this proxy fight was the election of two directors to the Board of Directors of Rospatch at its annual meeting of shareholders held on April 25, 1988. Plaintiffs allege that the management and Board of Directors of Rospatch Corporation engaged in misleading proxy solicitations in order to win the election.

On April 21, 1988 plaintiffs filed a complaint for injunctive relief, a motion for a temporary restraining order and a motion for a preliminary injunction in an attempt to enjoin Rospatch's 1988 Annual Shareholders' Meeting. This court denied plaintiffs' motions for a temporary restraining order and for a preliminary injunction. The election took place as scheduled and the two candidates nominated by Rospatch were elected to the Board of Directors.

On June 9, 1988 plaintiffs filed their first amended complaint, and on February 13 they filed their second amended complaint. Plaintiffs' three count second amended complaint alleges the following: (1) defendants conspired to solicit the proxies of the Coyne Group in violation of the Security Exchange Act and SEC regulations governing proxy solicitation; (2) defendants conspired to solicit proxies of the Day Trust without complying with the Exchange Act and SEC regulations governing proxy solicitation by means of distributing false and misleading proxy literature to the Day Trust; (3) defendants manipulated the procedures for soliciting proxies from Rospatch's employee shareholders in violation of the Security Exchange Act and the regulations thereunder. Plaintiffs ask this court to set aside the results of the 1988 election, to order a new election with respect to the two seats in dispute in this case, and to award plaintiffs the costs and disbursements of this action together with reasonable attorney fees, and the total expenses of the 1988 proxy solicitation.

A two day bench trial commenced on April 3, 1989. Plaintiffs informed the court that they have decided to abandon Counts I and III of their complaint. Thus, the court heard the proofs only with respect to count II of the complaint, alleging solicitation of the Day Trust's proxies in violation of Rule 14a–9. The court heard two witnesses and admitted 16 exhibits, including 6 depositions.

Peter Brockway, President of Corporate Development for Atlantis was plaintiffs' only witness who testified at trial. He testified as an expert on financial projections concerning the allegedly misleading nature of the information given to the Day Trust. Joseph Parini, the Chief Executive Officer of Rospatch, was defendants' only witness who testified at trial. His testimony related largely to his contacts with representatives of the Day Trust prior to the April 25th election.

I am faced in this case with several sets of inconsistent facts. I have read carefully all the offered deposition testimony and have reviewed the testimony heard in court during trial. Having heard the evidence, studied the exhibits, and listened to arguments of counsel, the following constitute the court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

*Finding of Fact*

The plaintiffs in this action are The Atlantis Group, Inc. and the Alizac Partners. Atlantis is a Miami-based organization that specializes in takeovers and leveraged buyouts. Atlantis is controlled by Earl W. Powell and currently owns 476,100 shares of Rospatch common stock. Alizac is a New York-based group of market speculators. The managing partner of Alizac is Lawrence Seidman. Alizac owns 238,100 shares of Rospatch common stock.

Rospatch is a diversified manufacturer headquartered in Kent County, Michigan. Rospatch has two basic divisions: wood products and technical products. The former manufactures stereo cabinetry and ready-to-assemble furniture. The latter manufactures a variety of high-tech products used primarily in the defense industry. Prior to August 1, 1988 Rospatch also manufactured labels for clothing. Rospatch's common stock is traded on the over-the-counter market.

In early 1987, Rospatch began a major restructuring program by selling relatively unprofitable subsidiaries and consolidating operations in order to maximize shareholder value. As part of its restructuring program, Rospatch sold its label equipment manufacturing unit, Thermopatch, in June of 1987. Rospatch also sold its relatively unprofitable auto welting division in 1987. In the summer of 1987 the Company consolidated its labeling operations into a single plant located in North Carolina.

In conjunction with its restructuring efforts, Rospatch hired Stern Stewart & Co. and Continental Illinois National Bank (collectively, "Stern Stewart") in mid–1987 to evaluate other value-adding alternatives. Stern Stewart is a professional appraisal firm. On November 16, 1987, Stern Stewart issued a report (the "Stern Stewart Report") to the Rospatch Board of Directors in which it sought to identify "the strategy likely to bring the most value to

the stockholders of Rospatch Corporation." (Stern Stewart Report at 1). The report estimated the value of the company to be between $24.76 and $41 per share. (Stern Stewart Report at 4). The report also contained detailed five-year projections for the Company as a whole and for each of its subsidiaries. These projections were substantially more optimistic than the company's internally generated projections. Based on its analysis, Stern Stewart concluded that Rospatch could increase shareholder value by taking further steps to restructure the company.

On November 9, 1987 Atlantis filed a Schedule 13D, stating that as of October 28, 1987, Atlantis owned 311,500 shares of Rospatch common stock, representing approximately 12.7 percent of the company's outstanding shares. A Schedule 13D is a form that is required to be filed by any group or person that becomes a beneficial owner of more than five percent of the stock of any company registered under the 1934 Exchange Act. 15 U.S.C. § 78m(d)(1). Alizac filed a 13D on September 22, 1987, reporting that it had purchased 130,500 shares, representing 5.3 percent of the company's stock.

In a letter dated November 30, 1987 (plaintiffs' exhibit 5) Atlantis announced its intention to nominate three individuals for election as directors of Rospatch during the annual meeting scheduled for April 25, 1988. Rospatch subsequently reduced the number of seats to be filled via this election from three to two. Atlantis' candidates for these two seats were Earl Powell and J. Bradley Davis. Opposing Powell and Davis were management's nominees, Paul K. Gaston and Keith VanderHyde.

On March 14, 1988 Atlantis and Alizac filed a joint 13D announcing the formation of the "Shareholders' Committee to Maximize Rospatch's Value." The committee was formed, according to the 13D, for the purpose of "supporting an alternative slate of directors for election at the 1988 Annual Shareholders' Meeting." In conjunction with their plan, both groups continued purchasing large blocks of Rospatch stock. At the time of the shareholders' meeting of April 25, Atlantis and Alizac jointly owned 22.5 percent of Rospatch's common stock.

Both Rospatch and the Atlantis/Alizac committee began soliciting proxies from shareholders through a series of mailings and by telephone. Important to both groups' efforts were the votes held by the largest two independent groups of shareholders, the Coyne group and the Williametta K. Day Trust. The Coyne group consists of members of a family that jointly own 207,600 shares of Rospatch Common stock, or approximately 8.9 percent of the stock. The Coyne group formerly had a 51 percent interest in Infrared Industries, a corporation purchased by Rospatch in 1986. As part of that transaction, the Coynes exchanged their interest in Infrared for Rospatch stock. The Coyne group is led by Michael Coyne and his two sons, Thomas and Kevin.

The Willametta K. Day Trust began purchasing Rospatch stock in February of 1986 and continued to do so through 1986 and 1987. At the time of the Annual Shareholders' Meeting, the Day Trust owned 189,829 shares of Rospatch stock, representing 7.71 percent of the outstanding shares of the company.

Rodney Watson, an investment adviser to the Day Trust, is the individual who first advised the Day Trust to invest in Rospatch. Watson is the head of investment research for the Trust Company of the West, which manages over $14 billion in institutional investments (Watson dep. at 6–8).

Early in 1988 Watson and Parini arranged to meet in New York in mid-February. Parini wished to review Rospatch's financial condition with Watson because he believed that he had managed to turn around certain operations that had been troublesome in the past. Parini wished to maintain the Day Group's ongoing support. (Watson dep. p. 12). At the February meeting Parini discussed the financial condition and outlook of Rospatch, division by division with Watson. (Watson p. 16). He also gave Watson a 12 page excerpt of the Stern Stewart report. (Parini trial testimony p. 27).

The 12 page excerpt given to Watson and later to other representatives of the Day Trust is at the crux of this controversy. The excerpt contained projections from the Stern Stewart report pertaining to the anticipated future of Rospatch on a division by division basis. In the excerpt, Parini chose to white out a portion of the projections which gave a valuation figure for 1988. The excerpt also did not include consolidated projections for the entire company and summaries which explain the underlying assumptions upon which Stern Stewart based its projections. Among the omitted explanations is the following statement: "By reducing the number of businesses they oversee management will be better able to resolve problems and identify opportunities that will lead to higher values for the businesses that remain." (Report p. 5—plaintiffs' Exhibit 1). Thus, among the assumptions discussed in the report was the assumption that Rospatch was to be restructured or the Technical Products Group sold in order for the projections to be realistic.

Sometime between February 15th and March 25th, 1988, Parini received a phone call from Steven Holzman, who has been an adviser to the Day Trust since 1983. Holzman, a CPA, had been closely following Rospatch, reading reports and talking to Parini and others knowledgeable in Rospatch's industry for several years. (Holzman Dep. at 12–13). Holzman informed Parini that in all likelihood, the Day Trust would not support management's slate in the upcoming election, but rather would support the Atlantis/Alizac slate. (Holzman dep., p. 14). Parini arranged to hold a breakfast meeting with Robert Day, Steven Holzman, and Rodney Watson on April 4, 1988 in Los Angeles. Parini also arranged to meet with representatives of the Coyne group in San Francisco later that same day.

The meeting between Parini, Watson, Holzman, and Day took place as scheduled on the morning of April 4, 1988. No minutes were taken and no written materials were produced at the breakfast meeting. (Parini testimony pp. 32–3; Holzman dep. p. 23). Parini reviewed the company on a division by division basis, presenting his views, his projections, and his opinion that liquidation of the company's Technical Products Group would be imprudent at that time. Parini discussed the anticipated financial performance of Rospatch for 1988 and mentioned specific numbers, emphasizing the fact that Rospatch was beginning to turn around. (Holzman Dep. pp. 20, 23). Parini also discussed the Stern Stewart Report at the meeting. (Parini testimony p. 30). As previously stated, no minutes or notes were taken during this meeting and no witness can recollect the exact figures which were mentioned by Parini during this meeting. (Parini testimony pp. 32–3). Thus, the court cannot determine which numbers specifically were discussed by Parini. The court, however, is satisfied that the projections in the excerpt from the Stern Stewart report were mentioned during the April 4th breakfast meeting, at least in response to questions by Rodney Watson. (Parini testimony, p. 34). Parini spent much of his time during the meeting answering questions that were put to him. (Parini testimony p. 29). Shortly after the April 4th meeting, Parini supplied Holzman with written projections. (Holzman affidavit, paragraph 6). The court is satisfied that Holzman received the three sets of projections collected in plaintiff's exhibit 3 all at once. (Holzman dep., p. 34). One of these sets was the 12 page excerpt of the Stern Stewart report which Parini had previously given Watson. Another set of figures was Rospatch's 1988 Operating Plan, and the third set was an internally generated five-year plan. The figures contained in the operating Plan and the five-year plan were much more conservative and realistic than the ones contained in the excerpt from the Stern Stewart report.

In addition, Holzman had two telephone conversations with Parini after the April 4 meeting. (Parini, trial testimony, p. 69). The parties vehemently dispute what was said during these phone conversations. Holzman testified in his deposition that he specifically discussed the numbers in the 12 page Stern Stewart report with Parini and that Parini told him that those numbers

were "absolutely" possible or doable. Holzman further testified that Parini expressed no limitations or conditions with respect to the Stern Stewart numbers. (Holzman dep., p. 25). Parini testified at trial that he told Holzman that if he wanted to know what management really thought, he should use management's figures. Parini further testified that he told Holzman that the projected figures were optimistic by two years. (Parini trial testimony, p. 37). The court also notes that in his deposition, Parini testified that he recalled no conversations between himself and Holzman concerning the Stern Stewart figures. (Parini dep. p., 116). Because Holzman is more or less an independent party who is unrelated to Atlantis or Alizac and because Parini, the president of Rospatch, is clearly a biased party whose deposition testimony is inconsistent with his trial testimony, the court accepts Holzman's version of the facts with respect to the two telephone conversations. Thus, I find that Holzman and Parini discussed some of the numbers projected in the 12–page excerpt of the Stern Stewart report and that Parini stated that some numbers were "doable" or "possible."

As soon as the breakfast meeting with the Days ended, Parini left Los Angeles to attend a luncheon meeting with Michael Coyne, Kevin Coyne, and Thomas Coyne in San Francisco. At this meeting Parini supplied the Coynes with projections found in the Stern Stewart report's appendix. This material included the projections' historical basis, thus enabling the Coynes to compare Rospatch's future projected performance to that which it achieved in the past in order to determine how realistic the projections were. Parini, however, did not provide the Coynes with underlying assumptions or explicit cautions or limitations with respect to the projections. (Michael Coyne dep., p. 13). Parini also provided the Coynes with excerpts from the "Rospatch Corporation Five–Year Plan." (Plaintiffs' Trial Exhibit 4). Parini did not guarantee to the Coynes that any of the projected figures he presented to them would be achieved. (Kevin Coyne dep., p. 49; Michael Coyne dep., p. 27).

Both the Day Trust and the Coyne Group voted for management's slate in the April 25, 1988 elections. (Holzman dep. p. 25; Michael Coyne dep. p. 25). The two directors nominated by management won the 1988 election. In 1988 Rospatch reported $3,341,000 in net earnings. In 1987 Rospatch's net income was approximately $1.6 million. Thus, in reality, Rospatch succeeded in doubling its net earnings. (Brockway p. 151).

## CONCLUSIONS OF LAW

■ Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), provides:

> It shall be unlawful for any person, ... in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security ... registered pursuant to section 78L of this title.

Rule 4a–9, promulgated by the Securities and Exchange Commission under section 14(a) of the Securities Exchange Act of 1934, provides that no proxy solicitation shall be made "which ... is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." It is well established that section 14(a) of the Securities Exchange Act of 1934 gives rise to a private cause of action. *Leff v. CIP Corp.*, 540 F.Supp. 857 (S.D.Ohio 1982). Thus, there is no question that a private cause of action exists in this case.

Under Rule 14a–9 a proxy solicitation is actionable if the solicitors are guilty of either of two violations: (1) the solicitors are prohibited from affirmatively making a false or misleading statement concerning a material fact; and (2) they are prohibited from omitting a material fact in conjunction with a proxy solicitation. Under federal law, falsity of a statement predicting a company's future performance "is deter-

mined by examining the nature of the prediction—with the emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis." *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) the Supreme Court established the standard for when the omission of a fact in conjunction with a proxy solicitation is actionable. The Court determined that an "omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." This standard contemplates

> ... a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

■ The Supreme Court emphasized that the question of materiality is "an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *Id.* 96 S.Ct. at 2130. Even sophisticated investors are entitled to the protection of Rule 14a–9. *Wheat v. Hall,* 535 F.2d 874 (5th Cir.1976). Under established law, plaintiffs in a proxy solicitation case need not prove subjective, actual reliance on the part of shareholders receiving the allegedly misleading information. *Mills v. Electric Auto–Lite,* 396 U.S. 375, 382, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970). As the Supreme Court stated in *Mills,* "reliance on the nondisclosure of a fact is a particularly difficult matter to define or prove." *Id.* at 382, 90 S.Ct. at 620.

Defendants argue that the standard established by the Supreme Court in the *TSC* and *Mills* cases should not be applied here since this case, unlike the Supreme Court precedents, involves not a mass mailing of allegedly misleading proxy materials, but a meeting with specific shareholders known to defendant Parini. Defendants contend that in cases involving the face-to-face dissemination of allegedly misleading statements, plaintiff must prove both materiality and reasonable reliance as is required in Rule 10b–5 cases. *See Rowe v. Maremont Corp.,* 850 F.2d 1226 (7th Cir.1988). In determining the question of reasonable reliance, courts may inquire into the "sophistication and expertise of the ... [recipient of allegedly fraudulent materials] in financial and securities matters." *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1516 (10th Cir.1983). Thus, defendants urge this court to create an exception to the general objective test applied to Rule 14a–9 cases and to rule that when materials are distributed in the context of a meeting with a small number of shareholders, reasonable reliance is to be proved by plaintiffs and the sophistication of the recipients is to be considered by the court.

Though the court finds defendants' argument to have some logic, defendants themselves admit that they can find no precedent or authority calling for the creation of an exception to the objective standard applicable to Rule 14a–9 cases. Moreover, an exception to the general rule may be impractical since it would be difficult to determine when such an exception would be applied. Would the court be required to consider the expertise of the recipient whenever materials were distributed in a face to face meeting with shareholders, even if there were 100 shareholders with different levels of sophistication in attendance? Alternatively, would the exception be limited to cases where a meeting was arranged with only one shareholder?

I further note that the Supreme Court in *TSC Industries* stated that in defining the standard of materiality, it sought to achieve a "balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability." 96 S.Ct. at 2132–3 fn. 10. Thus, the court established a reasonable investor standard and not a reasonable man standard. Pre-

sumably, an individual who is an investor is more sophisticated in financial dealings than is an ordinary person with no investment experience. I am consequently satisfied that even the objective test established in *TSC Industries* does not set a low standard.

I find as a matter of law that plaintiffs in this case need not prove reasonable reliance on the part of the Day Trust and that the court is to apply the reasonable investor standard set out in *TSC Industries*. However, in this case, under either the standard adopted by the court or that urged by defendants, the outcome is the same.

Plaintiffs in this case allege that defendants violated Rule 14a–9 and misled the Day Trust by taking the following actions:

(1) conveying the short form projections extracted from a detailed report by Stern Stewart without conveying at the same time the detailed assumptions, limitations and conditions on those figures as set forth in the remaining materials in the Stern Stewart report;

(2) failing to include past financial information within the financial data given to the Day trust representatives so that they could realize that the Stern Stewart projections were inconsistent with the historical earnings of the corporation;

(3) "whiting out" the valuation line on each page of the Stern Stewart report projections to disguise the fact that the report envisioned a restructuring of the corporation;

(4) Parini discussed the 12 page Stern Stewart report both at the April 4th meeting and later on the telephone with Holzman and stated that the numbers in those projections were "doable."

(Plaintiffs' post-trial brief, pp. 34, 36–39).

Plaintiffs' expert witness, Peter Brockway, President of Corporate Development for Atlantis, testified at length at trial concerning the misleading nature of defendants' proxy solicitation, as he saw it. Brockway, however, admitted that he is not an attorney or an expert in securities law and, therefore, is not competent to testify

whether a statement is "materially misleading" under the proxy solicitation rules. (Brockway cross at 92–94, 96). Furthermore, Brockway was not present in the April 4th meeting, was not a participant in any of the phone conversations between Parini and Holzman, and has no direct, first-hand knowledge of anything ever said by Parini to any representative of the Day Trust. (Brockway testimony, pp. 113–21). The court also notes that Brockway is an officer of plaintiff Atlantis and thus clearly has an interest in the outcome of this lawsuit. Brockway's testimony is, consequently, of limited usefulness to the court.

There is no dispute that the projections were given to Holzman in order to solicit the Day Trust's proxies and thus that Rule 14a–9 is applicable to this case. I am satisfied, however, that plaintiffs have failed to show by a preponderance of the evidence that defendants made either false or misleading statements with respect to a material fact or that defendants omitted to state a material fact necessary to make their statements not false or misleading. I shall address the alleged omissions first.

There is no dispute that the 12 page excerpt from the Stern Stewart report did not include the assumptions that Rospatch had to be restructured in order for the projected figures to be realistic. Furthermore, there is no dispute that it did not contain historical data that would have provided a basis of comparison between the projected figures and the company's past performance, and that the valuation lines were "whited out" in the excerpt. There is also, however, no dispute that Holzman received three different sets of projections including not only the Stern Stewart excerpt, but also Rospatch's 1988 Operating Plan and an internally generated 5–year plan. (Holzman dep. p. 34).

The figures contained in the Operating Plan and the 5–year plan were much more conservative and realistic than those contained in the excerpt from the Stern Stewart report. For example, whereas the Stern Stewart report projects a net profit after tax of $1.7 million for Rospatch's electronic systems division, the internal 5–

year plan projects only $810,000. Rospatch's internal 5–year plan, provided to Holzman, projected that the corporation's total earnings would be $3,537,000 in 1988. In reality, Rospatch reported total earnings of $3,341,000 in 1988. The difference between its projection and its actual earnings is thus only $159,000. (See plaintiffs' exhibit 3).

I am satisfied that the reasonable investor faced with these contradictory sets of figures would have realized that the more optimistic set must be based on some extraordinary assumptions and would have asked Parini for an explanation concerning the discrepancies. Holzman in his deposition admitted the following: "I relied on pages 1 through 12. It was laid out in a much easier manner to analyze. I'm not representing that I did a lot of analytical work in respect to our review here." (Holzman dep. p. 43). I find that pages 32–41 of plaintiffs' exhibit 3, containing the company's internally generated 5–year plan, are as easy to read as the first 12 pages of the exhibit. I am satisfied that the reasonable investor, faced with an important decision concerning the company's future, unlike Holzman, would not have simply ignored everything but the first 12 pages of the material given him. The reasonable investor would have compared the different sets of figures, analyzed them, and noted the substantial discrepancies between the Stern Stewart figures and the company's own projections. These discrepancies in themselves would have cautioned the reasonable investor that the extremely optimistic Stern Stewart figures alone should not be relied upon blindly and must be based on some extraordinary assumptions, even if he were not told so explicitly. Thus, I am satisfied that there is no substantial likelihood that an explicit statement that the projections in the Stern Stewart excerpt were based on an assumption of the company's being restructured would have been viewed by the reasonable investor as having significantly altered the "total mix" of the information made available. *TSC Industries, supra.*

I am also satisfied that the elimination of historical data from the Stern Stewart ex-

cerpt does not constitute an actionable omission. I am satisfied that the reasonable investor would follow Rospatch's performance every year through reading annual and quarterly reports as Holzman testified he in fact did. (Holzman dep. p. 12). Thus, within the "total mix" of information made available in this case to the Day Trust prior to the election, was historical data, presented in the company's quarterly and annual reports, which would have enabled the reasonable investor to compare Rospatch's past performance to the performance predicted by the Stern Stewart projections. In light of the already available information, the reasonable investor would have easily realized that the Stern Stewart projections predicted a dramatic departure from past trends. Thus, under the circumstances, a presentation of historical data alongside the projections is not substantially likely to have been viewed by the reasonable investor as having significantly altered the "total mix" of available information.

Plaintiffs argue that the company's annual reports cannot be considered as part of the "total mix" of information made available to the reasonable investor. They contend that the court is to consider the Day Trust as having only the information provided to it in the April, 1988 proxy solicitation. I am satisfied, however, that past annual reports, which are readily accessible to all shareholders, are to be considered as part of the "total mix" of information made available in this case. I find that the court would be reading too much into the language of *TSC Industries* if it were to limit its inquiry only to information made available in a particular disclosure. The language of *TSC* allows for inquiry as to "the 'total mix' of information made available" and does not specify when the data to be considered is to have been conveyed.

In *Shamrock Holdings Inc. v. Polaroid Corp.,* 709 F.Supp. 1311 (D.Del.1989), a case involving claims under section 14(a), the court specifically considered past annual reports as part of the total mix of available information and held: "[a]s regards the lack of historical data, the Court be-

lieves the contrast between the 1987–88 data and the 1989–95 projections is sufficient to put shareholders on notice that management's projections are optimistic, and a departure from past results." *Id.* at 1322. Likewise, this court finds that past annual and quarterly reports may be viewed as part of the "total mix" of information made available in a Rule 14a–9 case.

Plaintiffs make much of the fact that Parini "whited out" the valuation line in the Stern Stewart excerpt. I am satisfied, however, that the valuation line does not constitute a material fact in this case. Plaintiffs' witness, Peter Brockway, testified that the inclusion of the valuation figures in the material given to the Day Trust would have done no more than to suggest to a reader that the projections contained in the report were not ordinary management projections, but were made in the unusual context of a valuation report. (Brockway testimony p. 52). A valuation figure is not included in ordinary company projections; rather, it is included only in valuation studies. Consequently, plaintiffs claim that had the Day Trust representatives seen the valuation figure in the Stern Stewart excerpt, they would have known that the projections were not ordinary projections, but a part of an unusual study and would have been less likely to rely upon them. As discussed above, however, I am satisfied that the reasonable investor would have become suspicious of the Stern Stewart figures by virtue of the fact that other projections provided to him were significantly lower than Stern Stewart's. The reasonable investor would not have needed a valuation figure to suggest to him that the Stern Stewart projections might be a part of an unusual study and to dissuade him from relying solely upon them. Consequently, the inclusion of the valuation lines in the Stern Stewart excerpt is not substantially likely to have been viewed by the reasonable investor as significantly altering the "total mix" of information available.

I now turn to plaintiffs' allegations of affirmative acts on the part of defendants, that is, Parini's allegedly false or misleading statements with respect to material facts. Predictions are false and therefore actionable only if they fail to suggest reliability, bespeak caution, be made in good faith, or have a sound factual or historical basis. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186 (5th Cir.1988).

I am satisfied that plaintiffs have not proved by a preponderance of the evidence that Parini made materially misleading statements during the April 4th meeting itself. No documents were distributed during that meeting. (Holzman dep., p. 23). Furthermore, no minutes or notes were taken and no witness has any more than a vague and general recollection of what was said during the meeting. Plaintiffs' witnesses cannot remember any specific figures which were discussed during the April 4th meeting. (Holzman dep., p. 30; Watson dep., p. 34). Moreover, in his deposition, Watson testified that he asked Parini "probing" questions and that he got "frank and candid" answers to his inquiries. (Watson dep., pp. 41–2). Thus the court has before it no specific evidence of misleading or false statements made by Parini during the April 4th meeting.

Plaintiffs further claim that Parini affirmatively mislead the Day Trust due to the following: (1) the projections themselves constitute a false or misleading statement, and (2) in his telephone conversations with Holzman, Parini made false or misleading statements.

The projections given to the Day Trust in this case must be considered as a whole—the first 12 pages of the material cannot be isolated and judged independently. As discussed above, the material given to Holzman contained not only the overly optimistic Stern Stewart projections, but also the conservative and realistic internal projections prepared by Rospatch itself. The contrast between the different sets of figures should have alerted a reasonable investor to the fact that the more optimistic set must be based on extraordinary assumptions. In light of the content of the entire packet, I am satisfied that the pro-

jections given to the Day Trust were made in good faith and bespeak caution and thus are not misleading with respect to any material fact.

■ The court notes that during his February meeting with Watson, Parini gave Watson only the 12 page excerpt of the Stern Stewart report. I am satisfied, however, that this distribution of the material does not constitute a violation of Rule 14a–9. Since Holzman and Day were the decision makers who recommended to the Day Trust that it vote for management's nominees, (Holzman affidavit, ¶ 8) the projections given to Watson during his February meeting with Parini were not given in the context of an actual solicitation of proxies and thus are not covered by Rule 14a–9. Watson, in fact, does not even remember Parini mentioning a proxy contest during the February meeting. (Watson dep. p. 12). Parini set up a separate meeting on April 4th in order to solicit the Day Trust's proxies. Furthermore, when the decision concerning the vote was actually made by the Day Trust, all three sets of projections were available to Holzman and Day. Thus, the fact that initially only part of the material was given to one of the Day Trust's advisers is immaterial.

Parini's telephone conversations with Holzman after the April 4, 1988 meeting present a somewhat more difficult question for the court, but I am satisfied that plaintiffs have failed to prove by a preponderance of the evidence that Parini's statements during those conversations constituted a violation of Rule 14a–9.

The only testimony which plaintiffs presented concerning these conversations is the following account by Holzman:

Q: All right. Did you remember discussing those numbers specifically with Parini in those telephone conversations before the April 25th, 1988 meeting?

A: I don't recall discussing every number.

Q: All right.

A: But I recall discussing in depth the first 12 pages.

Q: All right.

A: Because this is the crux of the material.

Q: All right. Did Parini express any opinions to you as to the—I think you answered it before. I want to get, again, as to the likelihood that at least base case numbers reflected in the first 12 pages of exhibit A would be achieved by the corporation?

A: Absolutely.

Q: What did he say?

A: That when I asked him, "you know, Joe, is this number really possible?"

"Absolutely," he said to me. You know, and I—

Q: Did he express any limitations or conditions in respect to those numbers when you discussed them with him?

A: No.

(Holzman dep., pp. 24–25).

This testimony is simply too vague to support a finding of a violation of Rule 14a–9. No notes were taken to document these conversations and no files were kept regarding Holzman's contact with Parini. Furthermore, Holzman does not provide a full account of everything said by Parini. Holzman quotes Parini only as saying the word "absolutely" in response to his question as to whether a particular number in the first 12 pages of the Stern Stewart excerpt was possible. Holzman does not relate whether his question had to do with a net profit after tax figure or with capital expenditures or some other number contained in the excerpt.

Holzman testified that Parini did not "express any limitations or conditions" with respect to the 12 pages in question (Holzman dep. p. 25) but there is no evidence that Parini dissuaded the Day Trust from looking at management's own conservative figures or even guaranteed that all of the figures projected by Stern Stewart would be achieved in 1988. Kevin Coyne, with whom Parini also met on April 4th and who represented a group holding even more stock than did the Day Trust, specifically, 8.9 percent of Rospatch's stock, testified that Parini did not repre-

sent that the projections he presented would "pan out for 1988" or state that they were "substantially certain to hold or come true." (Kevin Coyne dep. p. 49). Coyne's testimony makes it less likely that Parini gave the Day Trust sweeping and absolute guarantees.

Moreover, if Parini wanted the Day Trust to rely wholly upon the Stern Stewart figures, he would not have sent them any other figures, particularly ones that are substantially more conservative than those predicted by Stern Stewart. If Parini simply encouraged the Day Trust to be optimistic concerning Rospatch's performance or told them that Stern Stewart's prediction of a turn-around in the company was not unrealistic, he was not misleading the Day Trust in doing so. As Peter Brockway testified at trial, though Rospatch did not achieve the figures projected by Stern Stewart, which predicted a quadrupling of profits, the company's net income in 1988 was more than double that earned in 1987.

When he spoke with Holzman, Parini knew that the Day Trust had Rospatch's own 5–year projections in hand in addition to the Stern Stewart excerpt and that they were likely to be cautioned by the substantial discrepancies among the figures. Holzman's testimony concerning the phone conversations lacks detail and specificity. The testimony supports an allegation of misleading proxy solicitation only in that Holzman states that Parini represented that some unnamed number or numbers in the Stern Stewart report were "doable" or "possible." In light of all the evidence available to the court, I find that plaintiffs have failed to establish by a preponderance of the evidence that Parini made false or misleading statements with respect to material facts in violation of Rule 14a–9 during his telephone conversations with Holzman.

▬ In a civil case the burden is on the plaintiff to prove every element of his claim by a preponderance of the evidence. Thus plaintiffs must prove that it is more likely than not that defendants violated Rule 14a–9. As stated by the Supreme Court in *TSC Industries Inc. v. Northway, Inc.* the court must determine the significance of omitted or misrepresented facts to a "reasonable investor." The standard does not require consideration of the significance of omitted or misrepresented facts to an ordinary person or to a particularly naive or ignorant investor.

Moreover, the Supreme Court specifically noted that it sought to "avoid the adverse consequences of setting too low a threshold for civil liability" in Rule 14a–9 cases, and thus the standard of proof is a fairly high one. *TSC Industries*, 96 S.Ct. at 2133. Plaintiff must prove by a preponderance of the evidence that there is a *substantial likelihood* that disclosure of an omitted fact would have been viewed by a reasonable investor as having *significantly* altered the "total mix" of information made available.

Participants' recollections of a breakfast meeting and subsequent phone conversations during which no notes were taken are bound to be sketchy and inconsistent in view of the fact that many technical details concerning a multi-division company's past, present, and future performance were discussed. The court has not ignored plaintiffs' evidence of the omissions in the 12 page Stern Stewart excerpt and of bits and pieces of alleged comments by Parini, which support plaintiffs' claim. However, weighed against this evidence is the fact that Rospatch's own realistic projections were supplied to the Day Trust prior to the vote and that plaintiffs have presented only vague and undetailed accounts of what Parini said to the Day Trust concerning various projections.

In view of plaintiffs' obligation to prove this case by a preponderance of the evidence, I am unable to conclude that the evidence offered by plaintiffs outweighs that which is opposed to it. At most the evidence is equally balanced. Accordingly, I am satisfied that plaintiffs have failed to prove by a preponderance of the evidence that defendants' proxy solicitation was false or misleading with respect to any material fact, or omitted to state any material fact necessary in order to make the

statements therein not false or misleading in violation of Rule 14a–9. Accordingly, judgment of no cause for action shall be entered against Atlantis Group, Inc. and Alizac Partners. No costs are awarded.